IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE SKYE MINERAL PARTNERS, LLC. | : | Chapter 7 |
| | : | Bankr. No. 18-11430-LSS |

| | | |
|---|---|---|
| PACNET CAPITAL, | : | Civ. No. 18-2008-CFC |
| | : | |
| Appellant, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| SKYE MINERAL PARTNERS, LLC, | : | |
| SKYE MINERAL INVESTORS, LLC, | : | |
| and CLARITY COPPER, LLC, | : | |
| | : | |
| Appellees. | : | |

**<u>MEMORANDUM OPINION</u>**

November 16, 2020
Wilmington, Delaware

_[signature]_

CONNOLLY, UNITED STATES DISTRICT JUDGE

This is an appeal from the Bankruptcy Court's dismissal of a petition for the involuntary bankruptcy of Skye Mineral Partners, LLC ("Skye") filed by Appellant PacNet Capital (U.S.) Limited. The dismissal occurred as a result of an Order issued by the Bankruptcy Court on December 3, 2019. (B.D.I. 84)[1] The Order granted in part Skye's Motion to Dismiss (B.D.I. 12), granted the Motion to Dismiss Involuntary Chapter 7 Case filed by Skye Mineral Investors, LLC ("SMI") and Clarity Copper, LLC ("Clarity Copper," and together with SMI and Skye, the "Appellees") (B.D.I. 34), and denied as moot an emergency motion filed by PacNet seeking appointment of an interim Chapter 7 trustee and an extension of time for Skye to respond to the involuntary petition. The Bankruptcy Court set forth the reasons for the Order in a bench ruling made on December 3, 2018 (B.D.I. 86, 12/3/18 Hr'g Tr. ("Bench Ruling")). For the reasons set forth herein, I will affirm the Order.

---

[1] The docket of the Chapter 7 case, captioned _In re Skye Mineral Partners, LLC_, 18-11430-LSS, is cited herein as "B.D.I. __." The appendix filed in support of PacNet's opening brief (D.I. 8, 9) is cited herein as "A__," and the appendix filed in support of the Appellees' answering brief (D.I. 11, 12) is cited herein as "DA__."

## I.  BACKGROUND

### A.  Relevant Actors

Skye is a holding company owned by SMI, Clarity Copper, PacNet, and DXS Capital (U.S.) Limited.  PacNet and DXS are part of an entity called the Lippo Group.  Skye formerly owned over 99 percent of the equity in CS Mining, LLC, which operated a copper mine located in Utah.  Noble Americas Corp. was a secured lender to CS Mining.

### B.  The CS Mining Bankruptcy Case in Utah

In June 2016, some of CS Mining's creditors filed a petition for CS Mining's involuntary Chapter 11 bankruptcy in the Bankruptcy Court for the District of Utah.  CS Mining ultimately consented to the involuntary filing and the Court confirmed a plan for CS Mining's liquidation in April 2018.  (DA675-682; DA760-897).  Pursuant to the plan, Skye's equity interest in CS Mining was cancelled.  (DA61-62).

Two events occurred during the Utah bankruptcy that are relevant to this appeal.  First, pursuant to a settlement agreement that resolved an adversary proceeding brought by CS Mining in the bankruptcy, CS Mining agreed to release all claims that it held against Noble.  (DA683-704).  Second, in August 2017, another Lippo Group entity, Tamra Mining Company, purchased substantially all of CS Mining's assets, including CS Mining's litigation claims against the Lippo

Group, through a court-ordered auction.  In what the parties refer to as the Sale

Order, the Utah Bankruptcy Court overruled SMI's objections that Tamra's

purchase of the assets in question would deprive members of CS Mining and Skye

of their ability to bring a derivative action against members of the Lippo Group for

alleged fiduciary duty breaches and that the sale was unfair because Lippo Group

affiliates had put CS Mining into bankruptcy in order to acquire CS Mining's

assets at a significant discount.  (A14).

### C.    The Chancery Court Action and Related Bankruptcy Litigation

On January 24, 2018, SMI and Clarity Copper filed a Verified Complaint in

the Delaware Court of Chancery, bringing certain claims directly, and others

derivatively on behalf of Skye, against PacNet, DXS, other members of the Lippo

Group, and Noble.  (A202-253).  The Verified Complaint essentially repeats the

allegations underlying SMI's objections that the Utah Bankruptcy Court had

overruled when it approved Tamra's purchase of CS Mining's assets—i.e., that the

defendants engaged in fraud and breached various fiduciary and contractual duties

by divesting SMI and Clarity Copper of the value of their equity positions in Skye,

acquiring CS Mining's assets at a windfall discount, and divesting Skye of its

equity interest in CS Mining.  *Id.*  SMI and Clarity Copper alleged that through

these actions, the Chancery Court defendants breached multiple provisions of

Skye's operating agreement (Counts 1, 2, 6, and 14); breached the Noble loan

agreement (Count 9); violated fiduciary duties of loyalty, care, and candor (Counts

1 and 2); tortiously interfered with the Noble loan agreement (Count 7); breached

the implied covenant of good faith and fair dealing (Counts 8 and 10); engaged in a

civil conspiracy (Count 5); and perpetrated multiple frauds (Counts 11 and 13). *Id.*

On February 16, 2018, PacNet removed the Chancery Court action to the

Bankruptcy Court for the District of Delaware.  PacNet argued in support of

removal that the Chancery Court action was related to the CS Mining bankruptcy

case and it asked the Bankruptcy Court to transfer the removed action to the Utah

Bankruptcy Court.  (DA1058-2026; DA2027-2041).  Contemporaneously with the

removal, Tamra filed in the Utah bankruptcy case a motion asking that court (1) to

enforce the Sale Order and (2) to enjoin SMI and Clarity Copper from continuing

to prosecute their claims in the Chancery Court action.  (A257-835; DA972-1057).

Tamra argued in support of its motion that the Chancery Court action involved

claims that CS Mining had possessed and had either sold to Tamra or had released

pursuant to its settlement agreement with Noble.

On June 4, 2018, the Utah Bankruptcy Court denied Tamra's motion.

(DA2215-2233).  The Court held that it lacked jurisdiction to make a determination

regarding the nature of the claims in the Chancery Court action for four reasons.

*Id.*  First, no "arising under" jurisdiction existed to evaluate the Chancery Court

action claims because enforcing a sale order was not a cause of action arising

4

under the Bankruptcy Code. *Id.* Second, no "arising in" jurisdiction existed because "the crux of the matter is essentially a dispute over property between two non-debtor third parties—not an interpretation of what the [sale] order says." (DA2230). As the Court explained: "These types of disputes could and are routinely resolved in other, non-bankruptcy courts." *Id.* Third, no "related to" jurisdiction existed because CS Mining was not a party to the Chancery Court action, and the parties "agree[d] that the resolution of the [Chancery Court] Action will have no effect on the Debtor or its bankruptcy estate." (DA2231). And fourth, the "retention of jurisdiction" clause in the order that approved Tamra's purchase of assets could not create jurisdiction where none otherwise existed. (DA2231-32).

On June 18, 2018, after receiving a copy of the Utah Opinion, the Bankruptcy Court below remanded the Chancery Court action back to the Chancery Court and denied the motion to transfer the action to the Utah Bankruptcy Court. (DA2119-2122). The Bankruptcy Court granted this relief because "it has been determined that bankruptcy jurisdiction does not exist over the dispute in this action." (DA2121).

### D.   The Instant Petition and Second Removal of The Chancery Court Action

The day after the Bankruptcy Court remanded the Chancery Court action, PacNet filed this involuntary bankruptcy proceeding. (DA2123-2127). Although

PacNet is an equityholder of Skye, PacNet alleges in its petition that it is acting as

the holder of an "unsecured claim based on [a] loan guaranty agreement" in the

amount of approximately $5 million. *Id.* Three days later, PacNet and DXS again

removed the Chancery Court action to the Bankruptcy Court below. (DA135-292;

DA293-448; DA449-452). In support of removal, PacNet and DXS argued that the

Chancery Court action "is a core proceeding pursuant to 28 U.S.C. § 157(b)

because the claims in the Delaware Chancery Action are alleged to belong to

[Skye], a debtor in a chapter 7 proceeding pending before this Court, and

adjudication of the claims in the Delaware Chancery Action requires a resolution

of the issue of whether the claims are in fact property of [Skye's] estate, or whether

they are purchased claims belonging to Tamra." (DA140-41; DA298-99).

### E.    The Motions to Dismiss and Bench Ruling

SMI and Clarity Copper moved under Bankruptcy Code § 707(a) and

alternatively under Bankruptcy Code § 305(a) to dismiss the involuntary petition.

(A944-967). Skye joined in that motion and also moved to dismiss the involuntary

petition under Bankruptcy Code § 303. (B.D.I. 34; A968-994). PacNet filed its

objection (A1088-1120) ("Objection"), and SMI, Clarity Copper, and Skye filed a

consolidated reply brief in support of their motions (A1121-60). The motions to

dismiss were based on multiple grounds, including that: the involuntary petition

was filed in bad faith; PacNet cannot show that Skye is not paying its debts as they

come due; PacNet assigned its right to the proceeds of the guarantee claim to the CS Mining estate and, therefore, is not eligible to file the case; PacNet's claim is subject to a bonafide dispute; PacNet is not eligible to file the involuntary case because it is an insider holding a contingency claim; and the involuntary filing was a litigation tactic and the case should be dismissed.

The Bankruptcy Court conducted an evidentiary hearing on the motions on September 17, 2018. The parties jointly submitted a binder of thirty-seven exhibits. (9/17/18 Hr'g Tr. 4:19–8:12; A1164-68). At the outset, after argument from both sides on the unavailability of a PacNet representative for deposition prior to the hearing, and since the parties were prepared to proceed without witnesses, the Bankruptcy Court ruled that it would proceed with the hearing without witnesses. (*Id.* 4:19–12:8; A1164-72). The record reflects that there was no objection to this ruling.

During the hearing, PacNet made a series of admissions through its counsel regarding its intent in filing the involuntary petition and other facts regarding the two-party nature of the dispute at issue. Following the hearing, the Bankruptcy Court took the matter under advisement.

On December 3, 2018, the Bankruptcy Court issued its Bench Ruling. The Bankruptcy Court found that PacNet had failed to show that Skye is not generally paying its debts as they come due. (Bench Ruling 8:24–9:3; A1318-19). In the

7

Court's words: "There is no evidence that PacNet took any steps to collect on [a] debt prior to filing the involuntary petition." (*Id.* 17:14-16; A1327). The Court further explained that although the guaranty that PacNet seeks to enforce is unconditional, "that does not mean that payment is due upon request"; rather, prior to demand, the guarantee "is simply an obligation that might have to be paid." (*Id.* 8:14-18; A1318). With respect to PacNet's purpose for the involuntary filing, the Bankruptcy Court found that PacNet filed the involuntary petition in bad faith, as a litigation tactic in connection with the Chancery Court action, to substitute a Chapter 7 trustee for the Chancery Court plaintiffs as part of a two-party dispute. (*Id.* 15:20–16:3; 19:24–20:6; A1325-26; A1329-30). The Court cited PacNet's failure to make any effort to collect on its guaranty debt prior to forcing Skye into Chapter 7 as evidence that PacNet filed the involuntary petition with an improper purpose. (*Id.* 17:8-16; A1327).

On December 17, 2018, PacNet filed a timely notice of appeal. D.I. 1. The appeal is fully briefed. D.I. 7, 10, 13. The Court did not hold oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II.     JURISDICTION AND STANDARD OF REVIEW

I have jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(3). This

Court has summarized the standards of review that govern its consideration of an

appeal from bankruptcy court as follows:

> A District Court sits as an appellate tribunal when
> presented with an appeal from a final order of a United
> States Bankruptcy Court. This Court's standard of
> review is to review factual findings for clear error, and
> exercise plenary review over legal determinations. We
> review basic and inferred facts under the clearly
> erroneous standard. We exercise plenary review over
> legal issues. In reviewing ultimate facts, which are a
> mixture of fact and legal precept, we must break down
> the question of law and fact and apply the appropriate
> standard to each component.

*Cal. Air Res. Bd. v. La Paloma Generating Co.*, No. 1:17-CV-1698, 2018 WL

3637963, at *2 (D. Del. July 31, 2018) (quotations and brackets omitted)

(collecting precedent).

The "decision to dismiss a petition for lack of good faith rests within the

sound discretion of the bankruptcy court." *In re Tamecki*, 229 F.3d 205, 207 (3d

Cir. 2000); *accord In re Metrogate, LLC*, 2016 WL 3150177, at *8 (Bankr. D. Del.

May 26, 2016); *In re Shipman*, 2012 WL 4498001, at *4 (Bankr. D. Del. Sept. 28,

2012).

A district court will "not 'disturb an exercise of discretion [by the

Bankruptcy Court] unless there is a definite and firm conviction that the

[Bankruptcy] court ... committed a clear error of judgment in the conclusion it

reached upon a weighing of the relevant factors.'" *In re Nutraquest, Inc.*, 434 F.3d

9

639, 645 (3d Cir. 2006) (quoting *In re Orthopedic Bone Screw Prods. Liab. Litig.,*

246 F.3d 315, 320 (3d Cir. 2001)).  An abuse of discretion "must rest on a clearly

erroneous finding of fact, an errant conclusion of law or an improper application of

law to fact." *In re Diet Drugs*, 778 F. App'x 111, 115 (3d Cir. 2019)).  A court

abuses its discretion where its decision was "arbitrary, fanciful or clearly

unreasonable." *Democratic National Committee v. Republican National*

*Committee*, 673 F.3d 192, 201 (3d Cir. 2012) (quoting *Moyer v. United Dominion*

*Industries, Inc.*, 473 F.3d 532, 542 (3d Cir. 2007)); *Zacharias v. Foreman*, 2015

WL 849048, at *1 (D. Del. Feb. 23, 2015).  The test for an abuse of discretion is

"not what this court would have done under the same circumstances; that is not

enough.  The court must feel that only one order could have been entered on the

facts." *Diet Drugs*, 778 F. App'x at 115.

## III.   ANALYSIS

PacNet makes three arguments on appeal.  I address them seriatim.

### A.    Burden of Proof

PacNet first faults the Bankruptcy Court for "failing to conclude that [Skye],

the alleged debtor in this case, bore the burden of proof in demonstrating that the

involuntary petition was not filed in good faith." D.I. 7 at 13.  This contention,

however, rests on a distortion of what the Bankruptcy Court actually said.

The Bench Ruling and Order are unusual in that they resolve dual motions to dismiss (i) under § 303 by Skye, and (ii) under § 707(a) or § 305(a) by Skye, SMI, and Clarity Copper.  In the proceedings below, the parties disputed how the burden of proof should be imposed.  Skye and the other movants for dismissal took the position that it was PacNet's burden to show that the involuntary filing was made in good faith.  PacNet took the position that the moving parties bore the burden of establishing that PacNet had filed the petition in bad faith.  The parties maintain these respective positions on appeal.

Binding legal authority lends support to both sides' positions.  In *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015), the Third Circuit held that when a motion to dismiss an involuntary petition is filed pursuant to § 303 "in terms of allocating burdens of proof, [petitioning] creditors are presumed to have acted in good faith," and "[t]o dismiss the petition, the [alleged] debtor must show by a preponderance of the evidence that the [petitioning] creditors acted in bad faith." *Id*. at 335 (citing *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 105 (2d Cir. 2000)).  On the other hand, in *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000), the Third Circuit held that that when a motion to dismiss filed pursuant to § 707(a) "calls into question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith." *See also id*. ("Section 707(a)

11

allows a bankruptcy court to dismiss a petition for cause if the petitioner fails to demonstrate his good faith in filing.").

As the Bankruptcy Court noted, neither *In re Forever Green Athletic Fields*, *In re Tamecki*, nor any other case cited by the parties addresses how to allocate the burden of proof when a court is confronted simultaneously with motions to dismiss under § 303 and § 707. (Bench Ruling 9:21-10:17). The Bankruptcy Court determined, however, that it "did not need to reconcile the burden of proof [issue] here because PacNet's motivation or purpose in filing the involuntary petition is not disputed. The record is clear on why PacNet filed this case." (A1320). The Court then discussed in detail the record and what it showed about PacNet's purpose in filing the petition and the Court explained how that record warranted a finding of bad faith on PacNet's part. (A1321–A1330). Although the Court did not use the words "I find by a preponderance of the evidence that PacNet acted in bad faith," it is clear from its ruling that that is precisely what it did. The Court chose not to "reconcile" *In re Forever Green Athletic Fields* with *In re Tamecki* or the evidentiary standards of § 303 with § 707 because it did not have to do so in this case. Applying *either* standard resulted in the same conclusion—PacNet acted in bad faith. Thus, necessarily implicit in the Bankruptcy Court's ruling is a finding that Skye and the movants established by a preponderance of the evidence that PacNet acted in bad faith. Indeed, PacNet admits as much in its opening brief.

12

Its second argument on appeal is that "the Bankruptcy Court erred as a matter of law by concluding that [Skye] carried its burden of demonstrating that PacNet acted in bad faith by filing the involuntary petition." D.I. 7 at 19. I find therefore that the Bankruptcy Court did not erroneously fail to conclude that Skye bore the burden of proof in this matter.

## B.   Whether PacNet Filed the Petition in Bad Faith

As just noted, PacNet's second argument is that the Bankruptcy Court erred in concluding that Skye established by a preponderance of the evidence that PacNet acted in bad faith when it filed the involuntary petition. I cannot say, however, that the Bankruptcy Court's conclusion that PacNet acted in bad faith constituted a clear error of judgment or was arbitrary, fanciful, or clearly unreasonable. On the contrary, the Bankruptcy Court offered a detailed and thoughtful explanation about how PacNet's own admissions and the statements of its counsel warranted a finding that PacNet had filed the involuntary petition not to further a legitimate bankruptcy purpose or collect a debt that Skye had refused or even been demanded to pay, but instead to gain a tactical advantage in a two-party dispute between majority and minority equity holders that was properly before the Court of Chancery. (Bench Ruling 19:21-20:6).[2]

---

[2] PacNet raises the issue of whether its counsel's statements, in written legal pleadings and at oral argument, were admissible evidence of PacNet's intent. D.I. 7 at 20-27. According to PacNet they were not, and the Bankruptcy Court had

"zero evidence" before it regarding the relevant factors in assessing PacNet's purpose in filing the involuntary petition. "A trial judge's decision as to whether a lawyer's statement is a judicial admission is reviewed on appeal for abuse of discretion." Robert E. Larsen, Navigating the Federal Trial § 12:23 (2018).

The totality of the circumstances test includes a review of both subjective motivations and the objective reasonableness of a petitioner's actions before filing an involuntary petition. *In re Luxeyard Inc.,* 556 B.R. 627, 641-42 (Bankr. D. Del. 2016). In determining that the "the record is clear on why PacNet filed this case," the Bankruptcy Court did not rely solely on statements made in oral arguments in assessing PacNet's subjective intent. As the Bankruptcy Court notes, "PacNet tells us ***in its opposition, which was echoed during argument***, this opposition as incorporated into its response to interrogatory which was Exhibit 19 and, in particular its response to Interrogatory 1." (Bench Ruling at 10:25-11:4 (emphasis added)). "PacNet filed this case in order to have an independent Chapter 7 Trustee appointed to evaluate and adjudicate any claims the alleged debtor owns against any party." (*Id.* at 11:5-8). PacNet does not explain why the Bankruptcy Court's consideration of PacNet's statements in briefs and discovery responses constituted an abuse of discretion.

More importantly, courts in this district recognize that, because an attorney is a party's "authorized legal agent," his or her statements are party admissions. *See, e.g., United States v. Cook,* 2018 WL 6499872, at *8 (D. Del. Dec. 11, 2008). The Court has noted "ample authority" for the proposition "that an attorney's statement may bind the party whom the attorney represents." *In re Joy Global, Inc.,* 346 B.R. 659, 665 n.13 (D. Del. 2006). This is consistent with the general rule across jurisdictions that an attorney's statement "is treated as a judicial admission when the statement (1) is made during a judicial proceeding; (2) deals with a fact; and (3) is deliberate, clear, and unambiguous. When these three elements are met, the statement is viewed as conclusive on the factual issue, and binds the party both at trial and on appeal." Larsen, *supra,* § 12:23 (2018) (collecting the extensive precedent from the Circuit Courts of Appeal). "Such binding statements can be made almost anytime during the litigation," including "briefs" and during "oral arguments." Larsen, *supra,* § 12:23. Accordingly, an attorney's statements in court in support of his client's legal "positions" may constitute a party admission.

The cases cited by PacNet suggesting a different result are inapposite. *See* D.I. 7 at 20-21. In each of these three cases, the issue was whether a lawyer's representation regarding an underlying, unadmitted, out-of-court alleged piece of evidence – *e.g.,* the statements of an IRS official, the testimony that a client would give, the content of a written report – was itself "evidence." In each case, the court

In the context of an involuntary petition, the standard for evaluating a petitioning creditor's bad faith is the "totality of the circumstances," *Forever Green,* 804 F.3d at 335, which is "a fact intensive review." *In re Diamondhead Casino Corp.*, 540 B.R. 499, 507 (Bankr. D. Del. 2015); *see also In re Diamondhead Casino Corp.,* 2016 WL 3284674, at *16 (Bankr. D. Del. June 7, 2016); *In re Metrogate, LLC,* Case No. 15-12593 (KJC), 2016 WL 3150177, at *12 (Bankr. D. Del. May 26, 2016).  The record here justifies the Bankruptcy Court's finding of bad faith based on the totality of the circumstances.  PacNet filed the involuntary petition to move the litigation out of the Chancery Court in order to substitute a Chapter 7 trustee for the plaintiffs in the Chancery Court action.  (*See* Bench Ruling 11:15-20 (A1321); 15:20-16:3 (A1325-26); 16:5-6 (A1326); 16:11-14, 22-23 (A1326); 19:24-20:6 (A1329-30)).  PacNet filed the involuntary petition a day after an adverse judgment forcing it to litigate the Chancery Court action in state court.  Its filing was a direct response to the Bankruptcy Court's remand of the Chancery Court action.  Skye experienced no other changes – financial, operational, or otherwise – that can explain the

---

concluded that such a representation was not evidence.  Those holdings have nothing to do with the facts here, where the issue is whether the statements of a party's counsel are evidence of the party's subjective intent regarding the very subject matter of counsel's role – namely to manage litigation.

involuntary petition's "suspicious" and "telling" timing. *Forever Green,* 804 F.3d at 336; *Metrogate,* 2016 WL 3150177, at *17.

PacNet admitted that the Utah Bankruptcy Court's "failure to reach the ultimate issue of whether CS Mining (or [Skye]) was the owner of the claims being asserted by the Majority Owners" prompted PacNet to file the Involuntary Petition." (Objection at 3 (third bullet point); A1094). PacNet thus admits that it filed the involuntary petition to redress the fact that the Utah Bankruptcy Court would not resolve whether the Skye's claims lack merit.

As a minority interest holder in the Skye, PacNet "could [have] br[ought] a derivative action on behalf of [Skye] against Clarity Copper, Skye Mineral Investors and their principals in the Court of Chancery" to pursue any meritorious claims that do exist. (Bench Ruling 11:25–12:5; A1321-22)). In stating in its Objection that it "should not have to prejudice its legal position vis-à-vis CS Mining and [Skye]" by filing a derivative claim," (Objection at 22 n.16; A1113), PacNet acknowledged that the hypothetical claims it refers to (and elsewhere denies) can be pursued derivatively. PacNet thus admitted to the Bankruptcy Court that it agreed that it would be possible for PacNet to file a derivative action on behalf of Skye as a matter of corporate law. (9/17/18 Hr'g Tr. 67:19–68:2; 68:16-21; A1227-28). PacNet further admitted to the Bankruptcy Court that, prior to filing the involuntary petition, PacNet had tried to get a receiver appointed, that

16

PacNet could consider the alternative or option of trying again to have a receiver appointed in Chancery Court, and that PacNet could have tried to get a receiver appointed in state court again. (*Id.* 77:10-20 (A1237); 132:5-13 (A1292)).

The record further supports the Bankruptcy Court's conclusion that the reason that PacNet was not pursuing other remedies is that doing so would be disadvantageous to it (wearing its equity and defendant hats) in the Chancery Court action. (Bench Ruling 12:5-11 (A1322); 15:23-16:4 (A1325-26); 18:25-19:4 (A1328-29)). "With its equity hat on it also has the right to bring a derivative action on behalf of the alleged debtor. To date it has not chosen to do so because it values its defenses in the Chancery Court action greater than any recovery on its guarantee." (*Id.* 18:25–19:4; A1328-29). PacNet admitted in its Objection that it did not want to "prejudice its legal position vis-à-vis CS Mining and [Skye]" by filing a derivative claim. (Objection ¶ 45 n.16; A1113). At oral argument, PacNet's counsel confirmed that PacNet could, but did not want to, file a derivative action as a matter of corporate law because in doing so PacNet would prejudice its defenses in the Chancery Court action. (9/17/18 Hr'g Tr. 65:6-10 (A1225); 67:19–68:2 (A1227-28); 68:16-21 (A1228)).

PacNet also contended in its Objection that appointing a Chapter 7 trustee was "a more efficient remedy" than proceeding derivatively in the Chancery Court (Objection ¶ 45 n.16; A1113), underscoring that PacNet simply preferred the

Bankruptcy Court over the Chancery Court. PacNet admitted to the Bankruptcy Court that, prior to filing the involuntary petition, PacNet had tried to get a receiver appointed, and that PacNet could consider the alternative or option of trying again to have a receiver appointed in Chancery Court, but that PacNet had declined to pursue that strategy prior to the involuntary petition because it assumed that SMI and Clarity Copper would object, the Chancery Court would have to decide the issue, no receiver would have been appointed, and therefore it would have all been a waste of time. (9/17/18 Hr'g Tr. 77:10-20 (A1237), 132:5-13 (A1292)). These admissions support the Bankruptcy Court's bad faith determination. Creditors who file bankruptcy petitions "to gain an advantage in pending litigation" – such as by avoiding the destruction of defenses it wants to advance in parallel cases – "act in bad faith." *Forever Green*, 804 F.3d at 335.

PacNet's admissions also supported the Bankruptcy Court's conclusion that PacNet's primary purpose in filing the involuntary petition was not the collection of debt, including where PacNet's view is that the Skye's current legal claims are not viable and thus have no value. (Bench Ruling 11:8-10, 21-25 (A1321); 15:20–16:3 (A1325-26); 19:24–20:6 (A1329-30)). The record supports this conclusion.

First, PacNet believes "that all claims in the Chancery Court action are double derivative claims and were sold to Tamra in the CS Mining bankruptcy." (*Id.* 11:21-25; A1321). As the Bankruptcy Court observed, PacNet "wants me to

18

either assume or make an assessment that the claims brought in the Chancery Court action on behalf of the alleged debtor are non-meritorious.  I am not in a position to do that." (*Id.* 18:3-6; A1328).  In its removal notice, PacNet states that bankruptcy jurisdiction exists for this Court to make "a determination as to whether those claims are property of [the Skye's] bankruptcy," which PacNet asserts "once belonged to CS Mining and now belong to Tamra." (DA-00136-37; DA-00294-95).  In its motion for an interim trustee, PacNet states that Skye supposedly has "an interest in properly analyzing [the Chancery Action] claims . . . and having the Court determine whether they are property of [Skye's] estate." (A1003).  PacNet thus argues that the Bankruptcy Court has jurisdiction over the Chancery Court action to determine that the claims are *not* property of the estate.  This is the *opposite* of the typical Chapter 7 case, which is filed to prevent asset dissipation and to maximize estate recoveries.  PacNet admitted to the Bankruptcy Court that PacNet's view is that Skye's real litigation-related assets are its potential claims against Richards and Walker,[3] which claims Skye had failed to pursue because it has conflicted management that has repeatedly shown an inability to act in Skye's best interest.  (9/17/18 Hr'g Tr. 91:16–92:17; A1251-52).

---

[3] David J. Richards controls SMI and is SMI's appointee to the Skye's board. Clinton Walker controls Clarity Copper and is Clarity Copper's appointee to the Skye's board.  D.I. 7 at 4.

PacNet further admitted to the Bankruptcy Court its view that Skye does not have valuable claims in the Chancery Court action because any of the alleged misconduct harmed CS Mining, such that CS Mining would own the claims, and that PacNet had purchased those claims in the CS Mining bankruptcy.  (*Id.* 129:20–130:1; A1289-90).  As it admitted to the Bankruptcy Court, PacNet's view is that Skye's claims in the Chancery Court action lack value not just because of who Skye has named as defendants, but also because of the nature of the legal theory, explaining PacNet's view that if the sole basis for seeking recovery from Richards and Walker were the same theory alleged in the Chancery Court action, then no viable claims exist.  (*Id.* 133:19-23; A1293).

Skye is a non-operating company with no business to liquidate: PacNet did not identify any dissipation of assets or other legitimate concern that could justify an involuntary Chapter 7 liquidation.  Although PacNet asserts that it filed the involuntary petition for the benefit of appointment of a Chapter 7 trustee, the Bankruptcy Court asserted that the "forum of the Chancery Court action is wholly irrelevant to collection of PacNet's debt."  (Bench Ruling 16:23–17:3; A1326-27).  "PacNet should be neutral as to the source of payment for its debt.  If the Chancery Court action is successful it will serve as a source of recovery for the $5 million dollars and PacNet may be able to set-off the $5 million dollar claim against any judgment against it."  (*Id.* 17:23–18:3; A1327-28).

Indeed, PacNet agreed with the Bankruptcy Court's view that PacNet should be neutral as to the source of payment for its debt. (9/17/18 Hr'g Tr. 91:5-7; A1251). PacNet further admitted to the Bankruptcy Court that one of its bases for filing the involuntary petition was that, with respect to the prospect of any recovery for Skye in the Chancery Court, PacNet did not know how those proceeds would be paid out in that litigation, referring to whether a receiver would then be appointed, whether notice and an opportunity to file claims would be afford to creditors, or whether many creditors would make claims. (*Id.* 83:8–86:1; A1243-A1246).

As the Bankruptcy Court noted in its ruling, "PacNet also wants me to assume that if plaintiffs are successful in the Chancery Court action Clarity Copper and Skye Mineral Investors will abscond with the funds or use the funds to pay other creditors. I have no evidentiary basis on which to draw such a conclusion." (Bench Ruling 18:7-11; A1328).

These findings support a conclusion that the involuntary petition did not serve the purpose of "preserving an ongoing concern or maximizing the value of the debtor's estate," or any other "valid bankruptcy purpose." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119-20 (3d Cir. 2004). Like the holding company in *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605 (3d Cir. 2009), PacNet's "sudden decision to file for bankruptcy despite [the purported debtor]

having been dormant and without employees or offices for several years" is an act

that "cannot escape the conclusion that the filings were a litigation tactic." *Id.* at

626.

### C.   Whether Skye was Not Paying Its Debts as They Came Due

Finally, PacNet argues that the Bankruptcy Court erred in concluding that

PacNet had failed to demonstrate that Skye was not paying its debts as they came

due.  The Bankruptcy Court found that "[t]here is no evidence that PacNet took

any steps to collect on [its] debt prior to filing the involuntary petition," and no

evidence that Skye engaged in any improper conduct.  (*Id.* 17:14-16; A1327).  The

record supports this conclusion.  Indeed, PacNet admitted that it had not even

requested payment from Skye on that claim.  (*See* DA2143, RFA No. 5).

## V.   CONCLUSION

A petitioning creditor must both satisfy the statutory requirements of § 303

and act with a valid bankruptcy purpose, or else the bankruptcy court will dismiss

the petition.  *Forever Green,* 804 F.3d at 334.  The Bankruptcy Court's findings

and the undisputed evidence established that PacNet did not possess a valid

bankruptcy purpose in filing the involuntary petition.  The record also supports that

the Bankruptcy Court's conclusion that "the involuntary petition was filed as a

litigation tactic to impact the Court of Chancery action in a two-party dispute

between majority and minority equity holders and the alleged debtor."  (Bench

Ruling 19:24–20:3; A1329-30).  For the reasons discussed above, the Bankruptcy Court did not abuse its discretion in dismissing the involuntary petition. Accordingly, I will affirm the Bankruptcy Court's Order granting in part the motions to dismiss the involuntary petition.

The Court will issue an Order consistent with this Memorandum Opinion.